**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

TERRY WOOLDRIDGE, JR.,

    Plaintiff,

v.                                      Case No:  6:14-cv-55-Orl-40TBS

CITY OF MELBOURNE,

    Defendant.

## ORDER

This cause comes before the Court without oral argument on Defendant's motion for summary judgment (Doc. 31), filed March 13, 2015.  Plaintiff responded on March 27, 2015 (Doc. 33), Defendant replied on April 9, 2015 (Doc. 34), and Plaintiff filed a surreply on April 20, 2015 (Doc. 37).  Upon consideration and review of the record as cited by the parties in their respective papers, the Court grants summary judgment in favor of Defendant.

**I.    BACKGROUND**

The parties' dispute in this case arises out of Plaintiff Terry Wooldridge, Jr.'s employment with the City of Melbourne (the "City") as a firefighter and the City's failure to promote Wooldridge to Assistant Chief of Administration.  Prior to his employment with the City, Wooldridge served for six years in the United States Air Force.  (Doc. 31-1, p. 3).  Immediately upon completing his term of active service, Wooldridge enlisted as a reservist and continued to serve in that capacity during his employment with the City.  (Doc. 31-24, p. 3).  Wooldridge voluntarily resigned as a firefighter for the City in 2014 after eleven years of employment.  (Doc. 31-25, 108:12–109:12).

Wooldridge states that his status as a reservist was a source of friction ever since

1

he started working for the City in 2003.  During a two-week orientation, Wooldridge recounted a story to another Air Force reservist about reporting and disciplining a subordinate for being drunk while on duty.  Several firefighters who overheard the story became upset with Wooldridge, referring to him as a "rat" and carving the word "rat" into the face of his locker at work.  (*Id.* at 65:11–66:22).

Throughout his eleven years of employment with the City, Wooldridge's coworkers and supervisors also made derogatory remarks about him as a reservist.  Wooldridge reports that some called him a "weekend warrior," implying that he was not fully committed to being a firefighter for the City, or a "double dipper," referring to the fact that reservists received up to thirty days of full pay from the City in addition to their reserve pay while on military leave.  (*Id.* at 58:2–15, 75:7–14, 85:24–86:4).  Others complained of the burden Wooldridge's reserve status caused on scheduling, including one battalion chief who asked Wooldridge on multiple occasions to postpone his reserve leave in order to avoid scheduling firefighters for overtime.  (*Id.* at 61:8–12, 82:6–16).  And an administrative assistant commented to Wooldridge a few times that he did not have enough "face time" at the fire department, suggesting that supervisors perceived Wooldridge's reserve leave in a negative light.  (*Id.* at 67:6–68:6).

Wooldridge additionally received backlash for befriending and supporting fellow reservist and firefighter Dominick Landolfi, who had sued the City previously for failing to promote him because of his reserve status.  Landolfi and Wooldridge were compared to Dr. Evil and Mini Me,[1] with one unknown individual superimposing Wooldridge's and

---

[1]   Dr. Evil and Mini Me are characters in the James Bond spoof *Austin Powers* movie series.  Dr. Evil serves as the antagonist in the films, in which he hatches different schemes to take over the world.  Mini Me appears in the second movie as Dr. Evil's clone and sidekick.  Mini Me is identical to Dr. Evil in every respect except that Mini

2

Landolfi's faces onto a picture of Mini Me sitting on Dr. Evil's lap. (*Id.* at 76:17–77:3). Coworkers, supervisors, and other city employees also referred to Wooldridge as "Dom's son," "mini Dom," and a "mole" for supporting Landolfi, and otherwise associated Wooldridge negatively with Landolfi for taking reserve leave. (*Id.* at 58:2–59:1, 61:13–62:16).

In February 2012, Wooldridge submitted an application for the position of Assistant Chief of Administration. (Doc. 31-15; Doc. 31-26, 190:5–10). The City determined that Wooldridge satisfied the minimum qualifications for the position and scheduled him for an interview. (Doc. 31-27, 64:10–17). Wooldridge and four other applicants appeared separately in front of a panel of five interviewers who scored each applicant based on traits such as leadership, problem solving, communication skills, and other qualities the City deemed necessary for the Assistant Chief of Administration. (*Id.* at 25:23–26:15; Doc. 31-17; Doc. 31-18). Wooldridge received the second highest score of the five applicants; as a result, he was not promoted to Assistant Chief of Administration. (Doc. 31-18; Doc. 31-27, 62:12–22).

On January 13, 2014, Wooldridge initiated this instant lawsuit against the City for violating the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301–4335, which protects members of the military from discrimination in employment based on their service. Wooldridge alleges that his membership in the United States Air Force Reserve was a motivating factor in the City's decision not to promote him to Assistant Chief of Administration and that, had the City's animus toward members of the military not been considered, he would have won the

---

Me is one-eighth Dr. Evil's size. *See* Wikipedia, *Austin Powers (film series)*, https://en.wikipedia.org/wiki/Austin_Powers_(film_series) (last visited July 10, 2015).

position.  The City now moves for summary judgment.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment.  Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials," but may also consider any other material in the record.  Fed. R. Civ. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law.  *Id.*  The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts.  *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006), *cert. denied*, 549 U.S. 996 (2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-movant must go beyond the pleadings and "come forward with specific facts showing that there is a

genuine issue for trial." *Id.* at 587(emphasis and internal quotation marks omitted); *see also Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (holding that a non-movant carries its burden on summary judgment only by "identify[ing] affirmative evidence" which creates a genuine dispute of material fact).

In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III. DISCUSSION

USERRA protects members of the military from discrimination and retaliation in employment on the basis of their military service. 38 U.S.C. § 4311. Discrimination under USERRA is defined broadly to include the denial of "employment, reemployment, retention in employment, promotion, or any benefit of employment" because of military service. *Id.* § 4311(a). Like other anti-discrimination statutes, USERRA is to be construed liberally to achieve its purpose of protecting those who serve in our armed forces from inequitable employment practices. *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005).

In order to prove discrimination under USERRA, Wooldridge bears the initial burden of establishing a prima facie case by showing by a preponderance of the evidence that his status as a reservist was a "motivating factor" in the City's decision not to promote him to Assistant Chief of Administration. *Id.* To be a motivating factor, Wooldridge's status as a reservist need not be the sole factor for the City's decision, but only one factor

which the City would truthfully identify "if asked for the reasons for its decision." *Id.* (internal quotation marks omitted). Stated differently, Wooldridge's reserve status is a motivating factor "if the [City] relied on, took into account, considered, or conditioned its decision on that consideration." *Id.* (internal quotation marks omitted). Because "discrimination is seldom open or notorious," circumstantial evidence is often critical to the motivating factor inquiry, requiring an analysis of factors such as:

> [P]roximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001).

If Wooldridge establishes a prima facie case of discrimination, the burden then shifts to the City to prove by a preponderance of the evidence that valid reasons standing alone would have caused it not to promote Wooldridge to Assistant Chief of Administration. *Coffman*, 411 F.3d at 1238–39. The City's success in meeting this burden acts as an affirmative defense and would bar Wooldridge from recovering under USERRA. *See Lewis v. Rite of Passage, Inc.*, 217 F. App'x 785, 786–87 (10th Cir. 2007). Importantly, the defense is available in both "pretext" and "dual motive" cases; the City can escape liability by proving either (1) it did not consider Wooldridge's reserve status in reaching its promotional decision, or (2) it would have reached the same promotional decision notwithstanding its improper consideration of Wooldridge's reserve status. *See Sheehan*, 240 F.3d at 1014.

Wooldridge produces sufficient evidence to establish a prima facie case of discrimination under USERRA. Supervisors and administrators made derogatory

comments whenever Wooldridge scheduled reserve leave. (Doc. 31-25, 61:8–12, 67:6–68:6, 82:6–16). Wooldridge's peers at the fire department also derided him for years as a "weekend warrior" and a "double dipper," both negative references to Wooldridge's reserve status. (*Id.* at 58:2–15, 75:7–14, 85:24–86:4). Further, Wooldridge's support of Dominick Landolfi resulted in scorn and ridicule, with supervisors and coworkers literally caricaturing both reservists as evil. (*Id.* at 58:2–59:1, 61:13–62:16, 76:17–77:3). Overall, this evidence evinces a general culture of disdain for reservists at the City. From this, a rational trier of fact could conclude that Wooldridge's status as a reservist served as a motivating factor for the City's employment decision.

However, the City proves by a preponderance of the evidence that it had valid reasons for not promoting Wooldridge and would have made the same promotional decision notwithstanding its improper consideration of Wooldridge's reserve status. The City's fire chief at the time, Paul Forsberg, explained at his deposition the process the City followed for selecting the new Assistant Chief of Administration. Candidates who met the minimum qualifications for the position were automatically scheduled for an interview. Each candidate then appeared before a panel of five interviewers to discuss the position. Each interviewer awarded the candidates up to five points in eight areas for a total possible score of 40 points. The candidate with the highest score among all five interviewers was to be selected for the position. (Doc. 31-27, 25:23–26:15, 62:12–22; 64:10–17).

Wooldridge's interview panel consisted of Assistant Chief Joe Sunday, Assistant Chief Bobby Apel, Fire Chief Paul Forsberg, Fire Chief Fran Murphy, and Police Chief Renee Purden. (Doc. 31-26, 201:17–202:8). The panel scored Wooldridge as follows:

|  | Sunday | Apel | Forsberg | Murphy | Purden | Average | Weight[2] | Score |
|---|---|---|---|---|---|---|---|---|
| **Alignment with Department and City Mission** | 4 | 4 | 4 | 4 | 3 | 3.8 | 2 | 7.6 |
| **Leadership** | 4 | 3 | 4 | 4 | 4 | 3.8 | 1.2 | 4.56 |
| **Problem Analysis & Decision Making** | 4 | 4 | 4 | 4 | 4 | 4 | 2 | 8 |
| **Communication Skills** | 4 | 4 | 4 | 4 | 4 | 4 | 0.4 | 1.6 |
| **Supervisory Ability** | 3 | 3 | 4 | 4 | 4 | 3.6 | 0.8 | 2.88 |
| **Technical Skills** | 5 | 5 | 5 | 3 | 4 | 4.4 | 0.4 | 1.76 |
| **Interpersonal Skills** | 4 | 4 | 4 | 4 | 4 | 4 | 0.8 | 3.2 |
| **Knowledge of City Operations** | 5 | 4 | 5 | 4 | 4 | 4.4 | 0.4 | 1.76 |
| **TOTAL** | 33 | 31 | 34 | 31 | 31 | 32 | X | **31.36** |

(Doc. 31-17, p. 2). The prevailing candidate scored a total of 36 points, 4.64 points higher than Wooldridge. (*Id.* at p. 1). Because Wooldridge did not receive the highest score, he was not promoted. (*See* Doc. 31-18; Doc. 31-27, 62:17–19).

The City produces evidence showing that the primary reasons the City scored the prevailing candidate so high were that the prevailing candidate had demonstrated superior job performance throughout his career, had held a leadership position within the fire department, worked well with staff, and was enthusiastic about his work. (Doc. 31-27, 10:23–12:6, 74:24–75:20). As to why Wooldridge's score was not higher, the only interviewer to be deposed for this lawsuit, Paul Forsberg, testified that his main concern grew out of Wooldridge's lack of experience supervising others while working for the City,

---

[2] Forsberg explained at his deposition that, prior to the interview process, he and other fire department administrators agreed that the areas of evaluation should be weighted based on their importance for the Assistant Chief of Administration position. The rationale was that the fire department did not want less important qualities such as knowledge of city operations to override more important qualities such as leadership. (Doc. 31-27, 93:22–96:20).

a shortcoming Forsberg foresaw as causing problems within the fire department. (*Id.* at 98:1–24, 101:20–102:7, 114:18–22). Forsberg confirmed that Wooldridge's reserve obligations played no part in his scoring and that he would have promoted Wooldridge had he earned the highest score. (*Id.* at 63:6–18, 99:5–9, 116:15–22). In fact, Forsberg scored Wooldridge the highest among the five interviewers and gave Wooldridge the same total score as the prevailing, non-military candidate. (*See* Doc. 31-17, pp. 1–2).

Wooldridge attempts to raise a factual dispute by taking issue with two aspects of the interview scores. First, Wooldridge submits that, had his interviewers not penalized him for his military status, his total score would have been higher. (Doc. 33, pp. 6, 14). Second, Wooldridge contends that the prevailing candidate should have been docked points for allegedly committing sexual harassment at work and for engaging in an extramarital affair. (*Id.* at pp. 6, 10–11, 13). Wooldridge concludes that if the interview scores were adjusted accordingly, his would be highest and he would have earned the promotion.

Neither of Wooldridge's arguments finds traction in the record. On his first argument, the only evidence Wooldridge cites which remotely speaks to his interview score are the sworn affidavits of Assistant Chief Greg Anglin and Firefighter Dominick Landolfi. Anglin states that he has participated in interview panels previously and that some interviewers in the past had negatively considered military status in scoring candidates for promotions. (Doc. 33-6, ¶¶ 7–8). However, Anglin did not participate in Wooldridge's interview and has no knowledge of whether the panelists in Wooldridge's case penalized him because of his reserve status. Further, Anglin does not indicate whether the interviewers he worked with in the past who viewed military service negatively were any of those who interviewed Wooldridge. Anglin's affidavit therefore provides no

insight into how Wooldridge's military status was perceived at the interview.

Landolfi avers that he witnessed one of the interviewers on Wooldridge's panel, Bobby Apel, treat Wooldridge with aggression and disdain due to his reserve obligations and because Wooldridge had supported Landolfi in a prior lawsuit against the City. (Doc. 33-5, ¶ 9). However, there is no factual dispute that the City would have made the same promotional decision notwithstanding any discriminatory considerations by Apel. Assuming, *arguendo*, that Apel had awarded Wooldridge the maximum points allowed in each area, thereby negating any inferences of discrimination in Apel's scoring, Wooldridge still would have scored 2.72 points lower than the prevailing candidate.[3]

Finally, there is no indication in the record that any other interviewer reduced Wooldridge's score because of his reserve status and a review of the other interviewers' scores yields no inference that Wooldridge's military service was viewed negatively by anyone. (*See* Doc. 31-17). Accordingly, Wooldridge's claim that he should have been scored higher is not supported by any affirmative evidence.

As to his second argument, Wooldridge does not suggest that the prevailing candidate's alleged misconduct was ignored or discounted by the panel in order to ensure that Wooldridge did not receive the promotion. Rather, Wooldridge only asserts that the interviewers should have factored the alleged misconduct into the prevailing candidate's score. (Doc. 33, pp. 6, 10–13). Wooldridge therefore forgets the law in his analysis. The question is not whether the City would have made the same promotional decision had it properly considered the prevailing candidate's alleged misconduct; the question is whether the City would have made the same promotional decision had it not improperly

---

[3] Adjusting Apel's scoring in the table above to reflect scores of five in every area, Wooldridge would have earned a total of 33.28 points.

considered Wooldridge's reserve status.  *Coffman*, 411 F.3d at 1238–39; *Sheehan*, 240 F.3d at 1014.  Because the prevailing candidate's alleged misconduct is irrelevant to this inquiry, it raises no dispute of material fact.  Moreover, the record reflects that the allegations of misconduct were investigated by the City and found to be unsubstantiated (Doc. 31-27, 12:7–14:12, 138:22–139:16), and a review of the other interviewers' scores yields no information on how or if the prevailing candidate's alleged misconduct was considered (*see* Doc. 31-17).

Wooldridge ultimately produces no affirmative evidence disputing that the City had valid reasons not to promote him and would have made the same promotional decision had it not improperly considered his reserve status.  Accordingly, the City is entitled to the USERRA affirmative defense.

## IV.   CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment (Doc. 31) is **GRANTED**.
2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant, City of Melbourne, and against Plaintiff, Terry Wooldridge, Jr.
3. The Clerk of Court is further **DIRECTED** to terminate all pending motions (Docs. 43, 44, 47) and to close the file.

**DONE AND ORDERED** in Orlando, Florida on July 13, 2015.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record